[No. 19796. Department One. July 7, 1926.]

CHARLES F. ALLISON, *Appellant*, v. W. R. LINN *et al.*,
*Respondents.*[1]

[1] WATERS AND WATERCOURSES (24)—WHAT CONSTITUTES A WATER-
COURSE—FLOWAGE FROM SPRING. Where there is a well defined
stream from a spring flowing in the dry season for two hundred
feet upon the lands of a riparian owner, his prior diversion for
domestic use and irrigation at a point on his own land is not
affected by the fact that the stream seeped into the ground and
apparently had "no mouth."

[2] SAME (60)—APPROPRIATION—PRESCRIPTIVE RIGHTS TO WATERS
OF SPRING. A notice of appropriation of water, not in itself a
legal appropriation, may, in connection with the actual appro-
priation and use, constitute sufficient notice to establish a prior-
ity of right in the appropriation.

Appeal from a judgment of the superior court for
Pierce county, Card, J., entered November 2, 1925, upon
findings in favor of the defendants, upon dismissing
an action involving the right to use the waters of a
stream, tried to the court. Reversed.

*Knickerbocker & Hunt,* for appellant.

BRIDGES, J.—The plaintiff brought this suit to estab-
lish his right to the waters of a certain spring and to
enjoin the defendants from interfering therewith. The
case was tried by the court, and a judgment was en-
tered denying the plaintiff any relief and dismissing
his action.

We have had considerable difficulty in satisfactorily
getting at the facts. The respondents have in no wise
appeared in this court; the case was tried upon various
affidavits, which were read into the record, and no oral
testimony was introduced; the maps pretending to
show the location of the various lands involved, the

[1]Reported in 247 Pac. 731.

spring and the course of the stream flowing therefrom, if any, the point or points of diversion, the location of various pipe lines, etc., are small and crudely drawn. We find, however, the following to be the facts, established in part by testimony undisputed, and in part by what we consider the great weight of the evidence.

A certain tract of land, located several miles northerly of the city of Tacoma, was patented in 1878 to one William Brown. In 1891, a part of this land was platted as the town of Irvington. Later, Sabra L. Edwards and others became the owners of a large portion of the platted tract, and particularly Lot 6 in Block 2, and all, or practically all, of Blocks 4 and 5. Their dwelling was located on Lot 6, Block 2. In 1922, these lands, together with others, were deeded to, and have since been the property of, the appellant. About 1922, the respondents became the owners of a part of the platted lands, and particularly Lot 4 in Block 2, on which was located their dwelling, which had been occupied for a number of years prior thereto by their predecessors in title. The two dwellings are only some fifty or seventy-five feet apart, and are located near the middle of the platted lands. About 1922, the respondents also became the owners of a part of the unplatted lands which had been patented to Mr. Brown. On these unplatted lands is located a spring, the waters of which, at least during certain portions of the year, flow upon certain of appellant's lots, and particularly Lot 9 in Block 4.

Prior to January, 1914, Sabra L. Edwards, and her associate owners of the lands now owned by the appellant, had undertaken to appropriate the waters coming from this spring, and used them for domestic purposes and for irrigation on some of their lands. The place of diversion seems to have been on Lot 9 in Block 4, owned by them. In January, 1914, Mrs. Edwards

posted a notice of her claimed rights in the waters of the spring, it being posted at the point of diversion on Lot 9, Block 4. From that time on, Mrs. Edwards and her associate owners used all the waters of the spring until they sold the property to appellant, who has made like use since his ownership, until the respondents, in 1924 or 1925, constructed a dam which diverted the waters of the spring from the appellant's lands. There is some claim that respondents' predecessors in interest of the land now owned by them undertook to make some appropriation of at least a part of the waters of the spring, but we are convinced that either their appropriation was of waters of other springs located in the neighborhood, or, in any event, was neither prior nor senior to the appropriation by appellant's predecessors in ownership. We are satisfied that, so far as appropriation goes, the appellant's rights are superior to any of respondents' rights, provided the waters were subject to appropriation.

It seems to have been assumed in the lower court that, if the water flowing from this spring was a stream in the ordinary sense of the word, that is, a stream flowing between well defined banks for at least a considerable portion of the year, then the waters were subject to appropriation; otherwise, not. The trial court seemed to be of the view that the waters flowing from the spring did not constitute a stream in any true sense of the word; and for that reason refused the plaintiff any relief. Certainly the weight of the testimony, as shown by the affidavits read into the record, was to the effect that, during the greater portion of the year, the waters flowing from the spring created a definite stream, flowing at a fixed location from the point of the spring located on respondents' lands onto and across a part of appellant's lands, and particularly Lot 9 in Block 4. It was on this lot that the appellant claimed

the right to divert the water. The trial judge viewed the premises in question, and particularly the spring and its flow. His view was in the summer, when the flow, as stated by him, would be as low as at any time. He said:

"My conclusion is that there is not a flowing stream. It does not lead to anywhere . . . I do not believe there is any right to appropriate waters of a spring like this. I concede, of course, the day we were there, there was a small amount of water, a small stream, flowing down for a certain distance, but it went back into the ground—seeped into the ground and was lost . . . . This small stream of water from the spring comes over onto the land of Mr. Allison (appellant) for a certain distance. . . . I think there is a small stream of water there that overflows from this spring, but it flows down about 200 feet, at least, on Mr. Allison's land and within this little ravine, and seeps away into the ground at that point. . . . I do not think it is a flowing stream at all. . . . I think a flowing stream must flow on down to a certain place and have a mouth somewhere. This does not seem to have any lower end, it seeps into the ground."

[1] We are afraid the learned trial judge was guided too much by what he saw at the dry season of the year, and was temporarily misled by the idea that, in order for there to be a stream in a legal sense, "it must flow on down to a certain place and have a mouth somewhere." But even if we take his view of the flow, it would seem that, at the time he visited the premises, there was a well defined stream for about 200 feet on appellant's lands. The fact, if it be such, that the waters then disappeared into the ground, or that there was no mouth to the stream, as suggested by the court, ought, it seems to us, make no difference. Even in the dry season the court apparently found a well defined stream to the point where the water disappeared into the ground, and, as we understand it, it was on that

portion of the stream that the waters have been here-
tofore, and are now, diverted. Some ten or twelve
witnesses testified that the spring waters flowed in a
natural channel to, upon, and across a part of ap-
pellant's lands, and that this flow continued throughout
the year. On the other hand, some five or six witnesses
thought there was no stream. It would appear that
one witness was about as competent as another to
testify to the facts. Another thing should be taken into
consideration. For many years appellant and his pre-
decessors in interest had found sufficient water in the
stream to divert it and thus supply their domestic and
other purposes. All these facts, together with what
the court found by a view of the spring, would seem to
require a holding that there was a well defined stream
running upon and over at least a part of appellant's
lands. The following are most of our cases on this
question: *Geddis v. Parrish,* 1 Wash. 587, 21 Pac. 314;
*Nielson v. Sponer,* 46 Wash. 14, 89 Pac. 155, 123 Am.
St. 910; *Dickey v. Maddux,* 48 Wash. 411, 93 Pac. 1090;
*Hayward v. Mason,* 54 Wash. 653, 104 Pac. 141; *Miller
v. Eastern R. & Lumber Co.,* 84 Wash. 31, 146 Pac. 171;
*Pays v. Roseburg,* 123 Wash. 82, 211 Pac. 750; *Weiten-
steiner v. Engdahl,* 125 Wash. 106, 215 Pac. 378.

[2] While the formal notice of appropriation,
posted by appellant's predecessors in interest at the
place of diversion, may not have been authorized by
law, and may not have, in itself, created a legal appro-
priation, yet it did give notice of claimed rights, and
that fact, taken with the fact of actual appropriation,
would be amply sufficient to establish appellant's
rights as appropriator.

The judgment is reversed, and the cause remanded
with instructions to grant the relief prayed for by the
appellant.

TOLMAN, C. J., HOLCOMB, and ASKREN, JJ., concur.